# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued February 9, 2010          Decided April 16, 2010

No. 09-7023

FAYUS ENTERPRISES, ON BEHALF OF ITSELF AND ALL OTHERS
SIMILARLY SITUATED, ET AL.,
APPELLANTS

v.

BNSF RAILWAY COMPANY, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-mc-00489-PLF-JMF)

---

*Christopher Lovell* argued the cause for appellants. With him on the briefs were *Gary E. Mason*, *Jared B. Stamell*, and *Richard J. Schager, Jr.*

*Alan M. Wiseman* argued the cause for appellees. With him on the brief were *Thomas A. Isaacson*, *Peter A. Barile III*, *Tyrone R. Childress*, *David G. Meyer*, *John M. Nannes*, *Tara L. Reinhart*, *Saul P. Morgenstern*, *Richard J. Favretto*, *Robert M. Jenkins III*, *Gary A. Winters*, *Richard McMillan Jr.*, *Kent Alan Gardiner*, and *Kathryn D. Kirmayer*. *Linda S. Stein* entered an appearance.

Before: ROGERS and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Plaintiff-appellants are firms that have indirectly purchased rail freight service from one or more of the defendant railroads. The traffic moves under railroad-shipper contracts that, pursuant to 49 U.S.C. § 10709, are generally not subject to challenge before the Surface Transportation Board ("STB" or "Board").[1] Plaintiffs allege that since 2003 the railroads conspired to impose fuel surcharges on the freight in a way that raised the shipping

---

[1] 49 U.S.C. § 10709(c)(1) (2006) ("A contract that is authorized by this section, and transportation under such contract, shall not be subject to this part, and may not be subsequently challenged before the Board or in any court on the grounds that such contract violates a provision of this part."). Shippers not wishing to enter into contracts can ship pursuant to common carrier rates that railroads must provide on request pursuant to 49 U.S.C. § 11101(b) (2006). The Board has authority to regulate the rates of common carrier traffic if the railroad has "market dominance" with respect to such traffic, *id.* §§ 10701(d), 10702(1), 10707, and to regulate the reasonableness of the railroad's "rules and practices" regardless of market dominance, *id.* § 10702(2). The Board can also "exempt" "a person, class of persons, or a transaction or service" when it finds that application of the regulatory regime "(1) is not necessary to carry out the transportation policy of [49 U.S.C. § 10101]; and (2) either—(A) the transaction or service is of limited scope; or (B) the application in whole or in part of the provision is not needed to protect shippers from the abuse of market power." *Id.* § 10502(a). Plaintiffs originally sought to challenge both § 10709 contract freight and § 10502(a) exempt freight, but they abandoned their claims involving § 10502(a) exempt freight in briefing before the district court and on appeal.

rates above competitive levels. Plaintiffs seek a judicial remedy for contract traffic that would match—and extend—the remedy that the Board gave common carrier traffic in *Rail Fuel Surcharges*, Ex Parte No. 661, 2007 WL 201205 (S.T.B. Jan. 25, 2007), but which it explicitly withheld from contract traffic, see *id.* at \*10.

Plaintiffs' antitrust allegations are part of at least eighteen separate class actions, consolidated before the district court, involving various putative classes of direct and indirect purchasers of rail freight services. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 593 F. Supp. 2d 29, 32 (D.D.C. 2008). (The direct purchasers raise only federal antitrust claims, which are still pending before the district court. *Id.* at 35-36.) The indirect purchasers sought injunctive relief for their antitrust claims under federal law; in addition, in order to secure damages precluded under federal law, see *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), they asserted various state law claims under theories of antitrust, consumer protection, unfair competition, and unjust enrichment and disgorgement of profits.

The district court dismissed the indirect purchasers' state law claims as preempted by the Interstate Commerce Commission Termination Act of 1995, 49 U.S.C. §§ 701-727, 10101-16106 ("ICCTA").[2] *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 593 F. Supp. 2d at 40. In the district court's view, "permit[ting] plaintiffs to pursue their state [law claims] . . . would require the application of different state antitrust and consumer protection laws to decide what defendants' fuel surcharges should have been—creating just the patchwork of railroad regulation that ICCTA sought to preempt." *Id.* at 38.

---

[2] There are also two sections not codified at the citation above, namely, 11 U.S.C. § 1162 and 45 U.S.C. § 797*l*.

The district court allowed the indirect purchaser plaintiffs to pursue their federal antitrust claim for injunctive relief, *id.* at 43, a claim still pending along with that of the direct purchasers. At the request of the parties, the court entered a final judgment for defendants on the state law claims under Fed. R. Civ. P. 54(b), thereby enabling an immediate appeal that would otherwise have been impermissibly interlocutory. This appeal duly followed.

The statute's express pre-emption clause obviously is the best available reflection of Congress's intent on the subject. *Sprietsma v. Mercury Marine*, 537 U.S. 51, 62-63 (2002). The section reads as follows:

> The jurisdiction of the Board over—
>
> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b) (2006). In this opinion, we will refer to the first sentence (ending with "is exclusive") as the exclusive jurisdiction clause, and to the second sentence (beginning with

"Except as otherwise provided") as the exclusive remedies clause.

* * *

In an argument that would, if it were sound, likely apply to all elements of their statutory analysis, plaintiffs invoke the following sentence uttered by the Board: "When Congress removed rail transportation contracts from the Board's regulatory purview, it expressly stated that not only state contract laws but also federal and state antitrust laws would apply fully to those agreements." *Kan. City Power & Light Co. v. Union Pac. R.R. Co.*, No. 42095, 2007 WL 934378, at *3 (S.T.B. Mar. 26, 2007). Plaintiffs argue in a footnote that we should defer to this statement under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

Lest there be any confusion on the point, we note at the outset that Congress did *not* "expressly state" what the Board said it had. The Board in fact cited only the House committee report, which on the page referred to by the Board merely stated, "If anti-competitive behavior is alleged, under this section, the antitrust laws are the appropriate and only remedy available." Comm. on Interstate & Foreign Commerce, Staggers Rail Act of 1980, H.R. Rep. No. 96-1035, at 58 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 3978, 4003.

In any event plaintiffs' conclusory assertion that we owe the statement *Chevron* deference encounters insuperable hurdles. First, we've several times noted that whether an agency decision against preemption of a state or local law receives *Chevron* deference is an open question in this circuit. See *Riffin v. Surface Transportation Bd.*, 592 F.3d 195, 197 (D.C. Cir. 2010); *Albany Eng'g Corp. v. FERC*, 548 F.3d 1071, 1074-75 (2008). Yet plaintiffs offer no argument on the

question; we commonly treat such an omission as a waiver. See, e.g., *United States v. Hughes*, 514 F.3d 15, 18 (D.C. Cir. 2008). The Supreme Court's recent treatment of the issue in *Wyeth v. Levine*, 129 S. Ct. 1187 (2009), declaring that "agencies have no special authority to pronounce on preemption absent delegation by Congress," *id.* at 1201, which several circuits have invoked in declining deference, see, e.g., *Franks Inv. Co. v. Union Pac. R.R. Co.*, 593 F.3d 404, 414 (5th Cir. 2010); *Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1214 (9th Cir. 2009), obviously puts the *Chevron* deference claim in further doubt.

But assuming in plaintiffs' favor that agencies are due *Chevron* deference for their rulings on preemption of state law, the Board's inaccurate remark in *Kansas City Power & Light* would not be due such deference. The Board was engaged in resolving whether it had jurisdiction over a shipper's complaint: it would if the rates in question were common carrier tariff rates subject to 49 U.S.C. § 10701(d)(1) (2006); *id.* § 10702, but would not if they were "contract rates" under § 10709. Because the rates fell into the common carrier classification under Board precedent, and the parties had reasonably relied thereon, it found jurisdiction but started a rulemaking to clarify the boundary between the two. It made the quoted observation about state antitrust claims only to illustrate the undisputed proposition that the classification had consequences. Such a dictum is plainly not entitled to *Chevron* deference. See *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001). What we have just said also disposes of any possible claim that we owe the remark deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

Thus we address the parties' arguments de novo.

\*    \*    \*

Plaintiffs object to the district court's preemption decision on two principal grounds. First, they say that § 10501(b)'s preemption provisions do not apply at all to freight transported pursuant to private contracts that are not generally subject to challenge before the Board. Second, they say that even if those provisions apply to such transportation, the state law remedies they seek are not remedies "with respect to regulation of rail transportation" and are therefore not the sort of remedies that § 10501(b) preempts.

Plaintiffs' argument that the preemption language of § 10501(b) does not apply to freight transported under private rail contracts has two related aspects: First, in plaintiffs' view, only the exclusive remedies clause is relevant to ICCTA preemption analysis; they criticize the district court for relying on cases discussing the exclusive jurisdiction clause to support its preemption holding, noting that the clause does not use the word "preemption." Second, the exclusive remedies clause has an express provision for exceptions "as otherwise provided in this part," and plaintiffs argue that their state law claims fall within that exception. We will start with § 10709(c)'s provision of an exception:

(1) A contract that is authorized by this section, and transportation under such contract, shall not be subject to this part, and may not be subsequently challenged before the Board or in any court on the grounds that such contract violates a provision of this part.

(2) The exclusive remedy for any alleged breach of a contract entered into under this section shall be an action in an appropriate State court or United States district court, unless the parties otherwise agree. This

> section does not confer original jurisdiction on the district courts of the United States based on section 1331 or 1337 of title 28, United States Code.

49 U.S.C. § 10709(c) (2006).

Plaintiffs read § 10709(c)(1) as taking private contracts completely outside the federal regulatory regime *and* as permitting plenary state regulation of freight moving under such contracts. This is a plainly erroneous reading. The provision merely limits the *Board*'s authority over the terms of private contracts.[3] The limitation was imposed as part of surface freight deregulation legislation adopted over the past several decades. It was not intended to restore any regulatory authority to the states.

Both the exclusive jurisdiction clause of the provision now found in § 10501(b), and the rule removing private contracts from federal regulation, were originally added to the U.S. Code as part of the Staggers Rail Act of 1980. See Pub. L. No. 96-448, § 208, 94 Stat. 1895, 1909 (originally codified at 49 U.S.C. § 10713(i) (1994), now codified as amended at 49 U.S.C. § 10709(c) (2006)) (private contracts); *id.* § 214(c)(5), 94 Stat. at 1915 (originally codified at 49 U.S.C. § 10501(d) (1994), now codified as amended at 49 U.S.C. § 10501(b) (2006)) (preemption). Contrary to plaintiffs' assertions that federal preemption of state remedies was first introduced in 1995, see Appellants' Br. at 29 (asserting that "[u]nder the Interstate Commerce Act remedies were not exclusive, but rather cumulative"), in fact the Staggers Act's exclusive jurisdiction clause gave preemption of state

---

[3] A quite separate way in which Board authority may be curtailed is through the Board's exercise of its authority under 49 U.S.C. § 10502(a) to "exempt a person, class of persons, or a transaction or service" on the making of certain findings.

remedies an explicit statutory basis. *G. & T. Terminal Packaging Co. v. Consolidated Rail Corp.*, 830 F.2d 1230, 1234 (3d Cir. 1987) (so holding, but noting that longstanding judicial interpretations of pre-Staggers Act legislation also had much preemptive effect).

Indeed, courts found many state laws respecting rail transportation to be preempted following the Staggers Act even though it contained only the exclusive jurisdiction clause and not a separate exclusive remedies clause such as exists today. Thus *G. & T. Terminal Packaging Co.* held, "Since [§ 10501(d) (1982)], as illuminated by legislative history, makes clear that the only remedies regarding rail rates are those provided by federal statutes, the savings clause, 49 U.S.C. § 10103 (1982) [which preserved common law "[e]xcept as otherwise provided in this subtitle"], has no application to this case." *Id.*; *Gendron v. Chi. & N. W. Transp. Co.*, 564 N.E. 2d 1207, 1218 (Ill. 1990) (finding a state law challenge to a transfer of a rail line approved by the ICC as preempted where "granting plaintiffs the legal and equitable relief they seek would [have] impermissibly interfere[d] with the ICC's broad authority over rail line transactions" and citing *inter alia* former 49 U.S.C. § 10501(d) for the proposition that "[t]he ICC's jurisdiction to approve or to condition approval of rail line transactions like the one challenged here is exclusive and plenary"); see also H.R. Rep. No. 104-422, at 167 (1995) (Conf. Rep.), *as reprinted in* 1995 U.S.C.C.A.N. 850, 852 ("[S]ince 1980, former section 10501(d) [predecessor of the current exclusive jurisdiction clause] and 11501(b) [a provision dropped in 1995, providing for limited state regulation under strict ICC supervision], with respect to rail transportation, had already replaced the former standard of cumulative remedies with an exclusive Federal standard, in order to assure uniform administration of the regulatory standards of the Staggers Act."); cf. *People v. Conrail Corp.*, 613 N.E. 2d 784, 793-94

(Ill. App. Ct. 1993) (arguing that former § 10501(d) "merely provides that *to the extent of the jurisdiction conferred by the Commerce Act*, the ICC and State authorities have exclusive jurisdiction with respect to transportation by rail carriers"; but the context was a claim that the Staggers Act preempted state environmental regulation, an issue which, as we explain below, is quite distinct from regulation of railroad-shipper relations).

This pulls both legs out from under plaintiffs' argument that § 10501(b)'s exclusivity provisions do not apply to the contract traffic in question. The exclusive jurisdiction clause and the cases construing it *are* relevant to the present issue, and § 10709's exception, whatever its ultimate effect, *leaves* § 10501(b) applicable to contract traffic.

The current provision largely removing private contracts from federal regulation (§ 10709(c)) also had its genesis in the Staggers Act. Railroads were authorized to enter into such contracts, and required to file them with the ICC, consistent with tariff rules to be developed by the Commission so as to make their essential terms available to the public. The Staggers Act directed the Commission to approve such contracts except in very limited circumstances. See Pub. L. No. 96-448, § 208, 94 Stat. at 1908-10 (originally codified as amended at 49 U.S.C. § 10713 (1994), now codified as amended at 49 U.S.C. § 10709 (2006)). Once so approved, a contract could not be challenged for violation of "this subtitle [subtitle IV, governing economic regulation of railroads]." *Id.* at 1909 (originally codified at 49 U.S.C. § 10713(i)(1) (1994), now codified as amended at 49 U.S.C. § 10709(c)(1) (2006)). Congress intended in 1980 to "clarif[y] the status of contract rate and service agreements in an effort to encourage carriers and purchasers of rail service to make widespread use of such agreements." H.R. Rep. No. 96-1430, at 98-99 (1980) (Conf. Rep.), *as reprinted in* 1980 U.S.C.C.A.N. at 4130-31. In its

*Rail Fuel Surcharges* decision, the Board said that § 10709 left the ICC with "no authority to regulate rail rates and services that are governed by a contract." 2007 WL 201205, at \*10.

Summarizing the Staggers Act's impact on the overall role of state law, the conference report said: "The remedies available against rail carriers with respect to rail rates, classifications, rules and practices are exclusively those provided by the Interstate Commerce Act, as amended, and any other *federal* statutes which are not inconsistent with the Interstate Commerce Act. No state law or federal or state common law remedies are available." H.R. Rep. No. 96-1430, at 106 (emphasis added), *as reprinted in* 1980 U.S.C.C.A.N. at 4138. Discussing the new private contracts provision, the report noted, "The existing Federal antitrust laws apply to this section," see *id.* at 101, *as reprinted in* 1980 U.S.C.C.A.N. at 4133, suggesting by negative inference that state antitrust laws generally did not apply. By that stage, then, Congress had clearly preempted *state* regulation of rail transportation, *both* for ICC-regulated freight and freight moving under private contracts.

We then must consider whether any of the changes wrought by the ICCTA itself reduced the scope of Staggers Act preemption. They did not. The ICCTA did add the exclusive remedies clause to § 10501, along with the caveat that it would apply "[e]xcept as otherwise provided in this part." But, as we said earlier, this provision was merely a reorganization of pre-1995 law, under which federal remedies with respect to rail transportation were already exclusive, subject to parties' rights to contract enforcement. H.R. Rep. No. 104-422, at 167, *as reprinted in* 1995 U.S.C.C.A.N. at 852 ("[S]ince 1980, former section 10501(d) and 11501(b), with respect to rail transportation, had already replaced the former standard of cumulative remedies with an exclusive

Federal standard, in order to assure uniform administration of the regulatory standards of the Staggers Act."). Plaintiffs' view would require us to infer that the addition of the general "[e]xcept as otherwise provided in this part" clause somehow converted § 10709(c)(1)'s *pre-existing* provision for private contracts into a new source of state regulatory authority. See 49 U.S.C. § 10709(c)(1) (2006) (originally codified prior to amendment at 49 U.S.C. § 10713(i)(1) (1994)). They offer no reason supporting such a transformation.

The ICCTA, to be sure, altered the context slightly, but entirely in a deregulatory direction, making it most improbable that Congress intended to invite state regulatory authority into the picture. First, Congress further narrowed the authority of the regulatory agency (now the STB) to regulate private contracts, principally by eliminating certain procedures that allowed rather limited challenges before the old ICC. See H.R. Rep. No. 104-422, at 174, *as reprinted in* 1995 U.S.C.C.A.N. at 859 (describing the eliminated procedures as "very limited and seldom utilized"). But there was no change in § 10709(c)'s provision that contract rail transport "shall not be subject" to the provisions of the Act, meaning that the 1995 Act did not effect any substantive change on that score. See Pub. L. No. 104-88, § 102(a), 109 Stat. at 817 (codified at 49 U.S.C. § 10709(c)(1) (2006)).

Further, in one respect Congress explicitly expanded the scope of preemption: it deleted from the exclusive jurisdiction clause any reference to ICC-certified state authorities and the associated certification procedures. See Pub. L. No. 96-448, § 214(c)(5), 94 Stat. at 1915 (originally codified at 49 U.S.C. § 10501(d) (1994), now codified as amended at 49 U.S.C. § 10501(b) (2006)) ("The jurisdiction of the Commission and of State authorities (to the extent such authorities are authorized to administer the standards and procedures of this title pursuant to this section and section 11501(b) of this title)

over transportation by rail carriers, and the remedies provided in this title with respect to the rates, classifications, rules, and practices of such carriers, is exclusive."). This of course was a *de*regulatory move—not, as plaintiffs would have us believe, an invitation to states to fill the regulatory void created by federal deregulation. See, e.g., S. Rep. No. 104-176, at 6 (1995) ("The bill would also eliminate Federal certification and review procedures for State regulation of intrastate rail transportation. However, nothing in this bill should be construed to authorize States to regulate railroads in areas where Federal regulation has been repealed by this bill.").

In short, the ICCTA left the exclusive jurisdiction clause in full force, supplementing it with the exclusive remedies clause and its explicit exception, expressly alluding to the pre-existing § 10709(c)'s provision for contract actions.

\* \* \*

Plaintiffs' fallback argument is that their state law claims do not involve "regulation of rail transportation" and therefore are not preempted by § 10501(b). The district court discussed the state law claims of each type as a general class without discussing any state-to-state differences among the laws, see *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 593 F. Supp. 2d at 37-39, and on appeal both parties have generally followed the same approach. We therefore treat the plaintiffs as having waived any argument that unique aspects of certain states' law governing consumer protection, unjust enrichment, or antitrust might compel a different result for a class of plaintiffs whose claims would be governed by such laws. We will proceed, as the parties have, on the assumption that any differences in individual states' laws are immaterial to the preemption analysis.

Plaintiffs correctly point out that the ICCTA does not preempt all state and local regulations. The circuits appear generally, for example, to find preemption of environmental regulations, or similar exercises of police powers relating to public health or safety, only when the state regulations are either discriminatory or unduly burdensome. See, e.g., *Adrian & Blissfield R.R. Co. v. Village of Blissfield*, 550 F.3d 533, 539 (6th Cir. 2008); *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 643-44 (2d Cir. 2005) (including risk of permitting delay in assessment of burden); *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252-55 (3d Cir. 2007); *Friberg v. Kansas City S. Ry. Co.*, 267 F.3d 439 (5th Cir. 2001) (finding common law nuisance preempted); *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1331 (11th Cir. 2001)); cf. *City of Auburn v. U.S. Gov't*, 154 F.3d 1025, 1030 (9th Cir. 1998) (seeming to apply a broader preemption rule). Several of the cases, in addressing these environmental regulations, note that the ICCTA "does not preempt only explicit economic regulation." *N.Y. Susquehanna & W. Ry. Corp.*, 500 F.3d at 252; see also *City of Auburn*, 154 F.3d at 1030 (similar). By implication, such cases recognize that the core of ICCTA preemption is "economic regulation," which we take to refer to regulation of the relationship before us here, that of shippers and carriers.

Railroad-shipper transactions indeed pose a problem quite different from environmental regulation. As we have seen, § 10709(c)(1) explicitly makes actions in state or federal court the "exclusive remedy for any alleged breach of a contract entered into under this section." This provision for conventional contract enforcement obviously is an "[e]xcept[ion] . . . otherwise provided in this part" contemplated by the exclusive remedies clause. And courts readily provide such remedies. See *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212 (4th Cir. 2009) (affirming contract enforcement); *PCI Transp., Inc. v. Fort Worth & W.*

*R.R. Co.*, 418 F.3d 535, 545-46 (5th Cir. 2005) (recognizing propriety of state law contract claim but denying relief on the merits).

By contrast, the circuits have found shippers' quests for non-contractual relief to be preempted as would-be invasions of the regulatory domain. Thus in *Port City Props. v. Union Pac. R.R.*, 518 F.3d 1186 (10th Cir. 2008), the court preserved a shipper's contract claim against a railroad for ceasing service on a spur but found its tort claim to be completely preempted by ICCTA. *Id*. at 1188-91. And in *G. & T. Terminal Packaging Co.*, the court found that, for shipments exempted from regulation, the Staggers Act had completely preempted state common law remedies for railroad price discrimination among shippers. 830 F.2d at 1233-36.

The legislative history supports the courts' refusal to let non-contract state law intrude into the statutorily preserved shipper-carrier remedies. As the House Report on ICCTA said, "Although States retain the police powers reserved by the Constitution, the Federal scheme of economic regulation and deregulation is intended to address and encompass *all* such regulation and to be completely exclusive." H.R. Rep. No. 104-311, at 95-96 (1995) (emphasis in original), *as reprinted in* 1995 U.S.C.C.A.N. 793, 808; see also H.R. Rep. No. 104-422, at 167, *as reprinted in* 1995 U.S.C.C.A.N. at 852 (noting that some criminal statutes are not preempted by the ICCTA "because they do not generally collide with the scheme of economic regulation (*and deregulation*) of rail transportation" (emphasis added)); H.R. Rep. No. 96-1430, at 105, *as reprinted in* 1980 U.S.C.C.A.N. at 4137 (noting that the Staggers Act "reaffirms that where the commission has withdrawn its jurisdiction to regulate, the State could not

assume such jurisdiction").[4]  As the legislative comments quoted above make clear, Congress sought to avert the sort of frustration of its deregulatory purpose potentially inflicted by state rights and remedies outside the specifically preserved realm of contract breach.

Congress also recognized that enforcement of state law outside the contract realm could easily lead to balkanization, with shipments subject to fluctuating rules as they crossed state lines.  As the House Report on ICCTA said:  "Although States retain the police powers reserved by the Constitution, the Federal scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive.  Any other construction would undermine the uniformity of Federal standards and risk the balkanization and subversion of the Federal scheme of minimal regulation for this intrinsically interstate form of transportation."  H.R. Rep. No. 104-311, at 96, *as reprinted in*

---

[4]  This Report is addressed to the original Senate proposal, which explicitly stated the point made in the report with language omitted from the ultimate version, but that in other respects did not go *as far as* the ultimate version in curtailing state regulatory authority.  Compare S. Rep. No. 96-470, at 77-78 (1979) (Senate proposing that the statute contain a subsection making clear that "[f]ederal withdrawal from certain areas of regulation shall not be construed as relinquishing Federal jurisdiction"), with H.R. Rep. No. 96-1430, at 106, *as reprinted in* 1980 U.S.C.C.A.N. at 4138 (discussing House proposals, all adopted in the final version, that "only State authorities whose standards and procedures have been certified by the Commission may exercise jurisdiction over intrastate rail," that "[d]ecisions of State authorities may be appealed to the Commission," and that "where the Interstate Commerce Act provides an exclusive remedy, such remedy is not in addition to remedies under another law or at common law").

1995 U.S.C.C.A.N. at 808.[5] State antitrust claims obviously present a risk of balkanized legal norms, a risk not posed by federal antitrust law.

As pitched in this litigation, plaintiffs' state law claims would directly interfere with the ICCTA's deregulatory objectives. Plaintiffs left the basis for many of these claims unclear in their complaint, asserting only conclusorily that the defendants had violated various state laws. E.g., Indirect Purchasers' Consol. Am. Compl. ¶ 155 (alleging, without further elaboration, that "[d]efendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New York Gen. Bus. Law § 349 *et seq.*; and New York common law against restraints of trade"). But the legal theories plaintiffs have presented in briefing make clear that these claims are designed as a means of getting the district court to apply state law to assess the substantive "fairness" of the contracts the railroads entered into, including with reference to the manner in which the rates were computed. See *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 982 (11th Cir. 2008) (suggesting that if necessary a district court may use Rule 12(c) motions and the parties' memoranda to make sense of plaintiffs' allegations).

Thus, plaintiffs relied extensively before the district court on the argument that the Board, in *Rail Fuel Surcharges*, the proceeding that addressed fuel surcharges applied to common carrier freight, had found aspects of the rate computation "unfair" or "unreasonable." See Indirect Purchase Pls.' Mem. Opp'n Defs.' Joint Mot. Dismiss 40 ("[T]he STB has already

---

[5] Although the House Report is addressing a bill that lacks the phrase "with respect to rail transportation," there is no reason to suppose that inclusion of that phrase in the final bill reflected a congressional embrace of balkanization.

determined that the fuel surcharges at issue here are 'unreasonable,' 'misleading' and 'unfair' as contemplated by the consumer protection laws."); *id.* at 21 (describing this litigation as "seek[ing] recovery for conspiratorial and *unfair* overcharges" (emphasis added)); *id.* at 42 (characterizing the plaintiffs' claims as "challeng[ing] only the *unfair* and/or misleading nature of Defendants' fuel surcharges" (emphasis added)). And plaintiffs made no bones about their goal of extending the remedies that the STB ordered for *regulated* freight to freight over which Congress deliberately stripped the STB—*and states*—of any regulatory authority. See *id.* at 40 ("By raising consumer protection claims, Plaintiffs merely seek to enforce the STB's ruling . . . for claims arising in private contract."); *id.* at 29 ("[T]he court is asked only to enforce the STB's finding of unreasonableness such that Plaintiffs may obtain adequate redress.").

The law applicable to § 10709(c) contracts, of course, may involve state common law doctrines such as fraud and consideration, doctrines that will in some cases cause a contract to be negated or even modified. But whatever the circumstances in which unjust enrichment, consumer protection, or antitrust claims may be unpreempted, they do not include those before us, where those claims are advanced as a means of challenging the substantive *reasonableness* of the rates charged under private contracts.

We should say a few additional words about plaintiffs' state law antitrust claims, because plaintiffs make one argument against preemption unique to such claims: They point out that a provision of the ICCTA, by creating a rule of evidence applicable to state law antitrust suits (as well as to federal ones), arguably contemplates preservation of state antitrust actions. The statute provides: "In any proceeding in which it is alleged that a carrier was a party to an agreement, conspiracy, or combination in violation of a Federal [antitrust]

law . . . *or of any similar State law*, proof of an agreement, conspiracy, or combination may not be inferred from evidence that two or more rail carriers acted together with respect to an interline rate . . . [approved in accordance with § 10706(a)(2)]." 49 U.S.C. § 10706(a)(3)(B)(ii) (2006) (emphasis added). Plaintiffs also point to legislative history that seemed to contemplate the applicability of at least some antitrust law. For example: "The Conference provision retains this general rule, while clarifying that [§ 10501(b)'s] exclusivity is limited to remedies with respect to rail regulation—not State and Federal law generally. For example, criminal statutes governing antitrust matters not preempted by this Act, and laws defining such criminal offenses as bribery and extortion, remain fully applicable unless specifically displaced, because they do not generally collide with the scheme of economic regulation (and deregulation) of rail transportation." H.R. Rep. No. 104-422, at 167, *as reprinted in* 1995 U.S.C.C.A.N. 850, 852.

Although the question is not before us, there is nothing in our reasoning inconsistent with the notion that some *subset* of state or federal antitrust claims might permissibly be brought against railroads, for price-fixing or other violations. The relevant question is not whether all potential antitrust suits are preempted, but rather whether *this* antitrust suit, as formulated by the plaintiffs, impermissibly infringes the federal deregulatory interests in the ICCTA.

There has been a tension—and in federal antitrust law a radical change over time—between the goal of increasing consumer welfare in the economic efficiency sense and contrasting goals such as protecting small competitors or preventing the concentration of economic or political power without regard to economic efficiency. See *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993); *Coastal Fuels of P.R., Inc. v. Caribbean Petrol.*

*Corp.*, 79 F.3d 182, 192 (1st Cir. 1996). It is far from clear that state antitrust law has, as a general matter, made the transition that has marked federal law. See, e.g., Robert H. Bork, *The Antitrust Paradox: A Policy at War with Itself* 73-74 (Free Press 1993) (1978) (describing the movement to "consumer welfare orientation" under federal antitrust law); *id.* at 74-77 (discussing early U.S. Supreme Court cases striking down state antitrust laws in which liability turned on the unreasonableness of prices); Richard A. Duncan & Alison K. Guernsey, *Waiting for the Other Shoe to Drop: Will State Courts Follow* Leegin*?*, 27 Franchise L.J. 173, 173 (2008) (noting that even states generally following federal decisional law in antitrust matters typically "leave themselves an escape route if federal law varies from state statute or putative state policy goals").

*Illinois Brick*, which plaintiffs' suit expressly seeks to avoid, represents the Supreme Court's judgment that allowing plaintiffs to use an indirect purchaser theory offensively, while prohibiting defendants from using the theory defensively, "would create a serious risk of multiple liability for defendants," and "the possibility of inconsistent adjudications." 431 U.S. at 730. *Illinois Brick* also rested on the proposition that full recovery for direct purchasers would generate more effective enforcement of the law. *Id*. at 734-35. Application of state laws rejecting *Illinois Brick* would jeopardize the federal interest in protecting railroad regulation from inefficient norms and balkanization.

We are presented in this case with an antitrust claim that was unambiguously concerned not just with strict "economic efficiency" but also with resurrecting in a different form state-level regulation of railroads, by inviting judicial supervision of the reasonableness and fairness of rates charged to shippers. Allowing state law antitrust claims of *this* nature would undermine the deregulatory and anti-balkanization

policies underlying the ICCTA. We need not address imaginable state antitrust claims that might not run afoul of either of those congressional policies.

The judgment of the district court is

*Affirmed.*