# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 7, 2022          Decided May 17, 2022

No. 21-7093

IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST
LITIGATION - MDL NO. 1869,

DONNELLY COMMODITIES INCORPORATED, ON BEHALF OF
ITSELF AND ALL OTHERS SIMILARLY SITUATED, ET AL.,
APPELLEES

v.

BNSF RAILWAY COMPANY, ET AL.,
APPELLANTS

Consolidated with 21-7095

Appeals from the United States District Court
for the District of Columbia
(No. 1:07-mc-00489)
(No. 1:11-cv-01049)

*Donald B. Verrilli, Jr.* argued the cause for appellants.
With him on the briefs were *Benjamin J. Horwich*, *Glenn D. Pomerantz*, *Linda S. Stein*, *Kent A. Gardiner*, *Tara L. Reinhart*,

*Saul P. Morgenstern*, *Matthew M. Collette*, *John M. Majoras*, *Kristen Lejnieks*, and *Tyrone R. Childress*.

*Kathryn D. Kirmayer* and *Sarah Yurasko* were on the brief for *amici curiae* Association of American Railroads and American Short Line and Regional Railroad Association in support of appellants.

*Kathleen M. Sullivan* argued the cause for appellees. With her on the brief were *Michael D. Hausfeld*, *Brian A. Ratner*, *Stephen R. Neuwirth*, *Sami H. Rashid*, *Meegan Hollywood*, *Eamon O'Kelly*, *Paul M. Donovan*, and *Shawn Raymond*.

*Bryan J. Leitch*, Attorney, U.S. Department of Justice, argued the cause for *amici curiae* the United States and the Federal Trade Commission in support of appellees. With him on the brief were *Daniel E. Haar* and *Robert B. Nicholson*, Attorneys, *Joel Marcus*, Deputy General Counsel, Federal Trade Commission, and *Mark S. Hegedus*, Attorney.

*John C. Sullivan* was on the brief for *amici curiae* American Chemistry Council, et al. in support of appellees.

Before: TATEL[*] and MILLETT, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: This matter focuses on questions certified by the District Court for interlocutory review pursuant to 28 U.S.C. § 1292(b). In the underlying

---

[*] Judge Tatel assumed senior status after this case was argued and before the date of this opinion.

antitrust actions that gave rise to the certified questions, freight shippers ("Plaintiffs") allege that the nation's four largest freight railroads ("Defendants" or "Railroads") have violated the Sherman Act, 15 U.S.C. § 1, by "engag[ing] in a price-fixing conspiracy to coordinate their fuel surcharge programs as a means to impose supra-competitive total price increases on their shipping customers." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 520 F. Supp. 3d 1, 8 (D.D.C. 2021) (citation omitted). Before hearing summary judgment motions, the District Court considered Defendants' motions to exclude certain evidence on which Plaintiffs rely. Defendants argued the challenged documents were inadmissible under 49 U.S.C. § 10706(a)(3)(B)(ii)(II) ("Section 10706") as evidence of the Railroads' discussions or agreements concerning "interline" traffic.

Interline movements are shipments carried along two or more railroads' tracks under a common arrangement. Section 10706 states that "[i]n any proceeding" in which rail carriers are alleged to have violated antitrust laws, conspiracy "may not be inferred from evidence that two or more rail carriers acted together with respect to an interline rate or related matter and that a party to such action took similar action with respect to a rate or related matter on another route or traffic." 49 U.S.C. § 10706(a)(3)(B)(ii). The statute tellingly provides that "evidence of a discussion or agreement between or among" rail carriers "shall not be admissible if the discussion or agreement . . . *concerned an interline movement* of the rail carrier," and "would not, considered by itself, violate the [antitrust] laws." *Id.* § 10706(a)(3)(B)(ii)(II) (emphasis added).

The parties sharply disagreed over whether and how the rule of evidence under Section 10706 should be applied to the documents cited by Defendants in their motions to exclude evidence. As relevant here, the District Court held that "to be

protected by the statute, an interline movement must be an identifiable movement or movements with identifiable circumstances, such as a specific shipper, specific shipments, and specific destinations," 520 F. Supp. 3d at 29; and it further held that a discussion or agreement does not "concern" interline movements if it could also be said to concern other types of rail freight movements, *id*. at 33. The District Court denied "[D]efendants' motion for the exclusion of exhibits as a whole," *id*. at 34, and thus effectively denied full protection to the contested documents cited by Defendants. Instead, the District Court indicated that Defendants could "propose redactions to remove [from documents] discussions or agreements that concerned an interline movement of the rail carrier, and, where redaction is impracticable or not feasible, may request a suitable limiting instruction." *Id*.

Defendants then asked the District Court to certify its order for interlocutory appeal under 28 U.S.C. § 1292(b). The District Court agreed after finding that the "order involves a controlling question of law as to which there is substantial ground for difference of opinion and . . . an immediate appeal from the order may materially advance the ultimate termination of the litigation." *Id*.; *see In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2021 WL 2433737, at *4-6 (D.D.C. June 15, 2021). This court, "in its discretion," permitted the appeal under § 1292(b).

In pressing for interlocutory review, Defendants focused on two aspects of the District Court's judgment: "(1) that the phrase 'an interline movement' in Section 10706 means that the statutory protections apply *only* to discussions or agreements about 'identifiable . . . movements with identifiable circumstances, such as a specific shipper, specific shipments, and specific destinations,' and (2) that courts may implement the protections of Section 10706 through redactions and

limiting instructions." 2021 WL 2433737, at *3 (omission in original) (internal quotation marks and citation omitted). In the opinion that follows below, we will focus on these two principal issues and related matters. Because we find that the District Court's interpretation of Section 10706 sometimes strays from the literal terms of the statute, we affirm in part and reverse in part. Accordingly, we vacate the District Court's order and remand for the court to reconsider the evidence at issue consistent with this court's interpretation of Section 10706.

## I. Background

### A. Statutory Framework

Congress enacted the Section 10706 statutory rule of evidence as part of the Staggers Rail Act of 1980, Pub. L. No. 96-448, 94 Stat. 1895 ("Act"). The Act's "primary goal" "was to revitalize the railroad industry by reducing or eliminating regulatory burdens." *Coal Exps. Ass'n of the U.S., Inc. v. United States*, 745 F.2d 76, 80-81 (D.C. Cir. 1984). "[T]he underlying approach of the legislation was to move toward much greater reliance on market forces rather than regulation to govern rail carriage, but to temper that move with a policy of retaining regulation where the market would be insufficient to protect shippers and the public from abusive railroad practices." *Id.* at 81.

Rail freight traffic involves two types of movements: interline and single-line. Br. for the United States and the Federal Trade Commission ("FTC") as *Amici Curiae* in Support of Pls.-Appellees and Affirmance 1, 11. As explained above, interline movements are shipments carried along two or more railroads' tracks under a common arrangement. *Id.* at 1. In contrast, single-line shipments are moved by one carrier on

its own tracks. *Id.* Outside of their shared interline traffic, rail carriers generally compete with one another. *See id*.

"Facilitating interline traffic requires coordination among competing freight railroads over logistics and shipping rates." *In re Rail Freight Fuel Surcharge Antitrust Litig.–MDL No. 1869*, 725 F.3d 244, 247 n.1 (D.C. Cir. 2013). Therefore, as noted above, Section 10706 provides that proof of a conspiracy "may not be inferred from evidence that two or more rail carriers acted together with respect to an interline rate or related matter and that a party to such action took similar action with respect to a rate or related matter on another route or traffic." 49 U.S.C. § 10706(a)(3)(B)(ii). In addition to the bar against impermissible inferences, Section 10706 also precludes the admission of evidence of certain discussions and agreements between rail carriers. In relevant part, this statutory rule of evidence states:

> In any proceeding in which [an antitrust] violation is alleged, evidence of a discussion or agreement between or among such rail carrier and one or more other rail carriers, or of any rate or other action resulting from such discussion or agreement, shall not be admissible if the discussion or agreement—
> . . .

>> (II) concerned an interline movement of the rail carrier, and the discussion or agreement would not, considered by itself, violate the [antitrust] laws . . . .

> In any proceeding before a jury, the court shall determine whether the requirements of [this subclause] are satisfied before allowing the introduction of any such evidence.

*Id.*

### B. Facts and Procedural History

Defendants BNSF Railway Co. ("BNSF"), CSX Transportation, Inc., Norfolk Southern Railway Co., and Union Pacific Railroad Co. ("Union Pacific") account for the majority of rail freight traffic in the United States. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d at 247. "In some regions, the railroads' networks overlap. In others, tracks may belong almost exclusively to a single railroad." *Id.* Each of the Defendants interlines traffic with the others. *See id.*; Opening Br. of Appellants 4.

The instant actions concern Plaintiffs' challenges to rate-based fuel surcharges that the Railroads imposed on shipments. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d at 247-48. As we have previously explained:

> To offset fuel costs, freight railroads often include fuel surcharges on top of the base rates they charge their customers. These fuel surcharges have traditionally taken two forms. Mileage-based fuel surcharges raise total rates in proportion to shipping distances. Rate-based fuel surcharges, by contrast, depend on a prearranged "strike" or "trigger" price. When fuel prices are below the trigger price, no fuel surcharge supplements the base rate. But once fuel prices exceed the trigger price, a surcharge is imposed as a function of the base rate. . . .

> Rate-based fuel surcharges were not unheard of at the start of the new millennium, but neither were they the norm. That all changed by the mid–2000s, when

fuel surcharge provisions became ubiquitous, governing the vast majority of the [D]efendants' shipments. At the same time, the [D]efendants sharpened the surcharges' sting, with all four dropping their trigger prices between March 2003 and March 2004. . . .

The heyday of the rate-based fuel surcharge did not last. Eventually, the Surface Transportation Board (STB) put an end to the practice with respect to common carrier traffic within its regulatory authority. *See Rail Fuel Surcharges*, Ex Parte No. 661, 2007 WL 201205 (S.T.B. Jan. 25, 2007). The STB was especially troubled by the disconnect between the purported rationale for the fuel surcharges—fuel cost recovery— and the formula's dependence on base rates, which need not reflect the marginal fuel costs of a particular shipment. *See id.* at *4. The [STB] decision did not, however, directly implicate those shippers whose traffic was governed by bilateral contract. *See id.* at *10.

*Id.* at 248.

Following the STB's decision, shippers filed lawsuits alleging that the Railroads had violated antitrust laws by conspiring to fix fuel surcharges for traffic outside the STB's jurisdiction. *See id.* Two of those actions are now before this court. The first, *In re: Rail Freight Fuel Surcharge Antitrust Litigation, MDL No. 1869*, No. 1:07-mc-00489 (D.D.C.), includes cases brought against all four Defendants and consolidated by the Judicial Panel on Multidistrict Litigation. The matter has been before this court several times before. *See Fayus Enters. v. BNSF Ry. Co.*, 602 F.3d 444, 447-54 (D.C. Cir. 2010) (affirming dismissal of state law claims); *In re Rail*

*Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d at 254-55 (vacating class certification); *In re: Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 934 F.3d 619, 622-27 (D.C. Cir. 2019) (affirming denial of class certification). The second action, *Oxbow Carbon & Minerals LLC v. Union Pacific Railroad Co.*, No. 1:11-cv-01049 (D.D.C.), involves claims against Union Pacific and BNSF only.

In advance of the District Court's consideration of summary judgment motions in both cases, Defendants invoked Section 10706 to exclude certain documents upon which Plaintiffs seek to rely. Defendants argue that the contested documents are inadmissible under Section 10706 because they constitute evidence of discussions or agreements concerning interline movements. Noting that it would "be the first court to interpret Section 10706 since Congress enacted the statute in 1980," the District Court invited the Government to submit a statement of interest reflecting the views of the Department of Justice, the Federal Trade Commission, and the STB on the interpretation and application of the statute. *See* Order (Mar. 16, 2020), No. 1:07-mc-00489, ECF No. 947, *reprinted in* Joint Appendix ("J.A.") 420-22. The court also permitted the plaintiffs in a related multidistrict litigation pending before a different District Court judge to file memoranda addressing the motions. *See generally In re Rail Freight Fuel Surcharge Antitrust Litig. (No. II) - MDL No. 2925*, No. 1:20-mc-00008 (D.D.C.).

In the decision now under review, the District Court denied Defendants' motions to exclude evidence under Section 10706. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 520 F. Supp. 3d 1, 15-38 (D.D.C. 2021). The court held that a discussion or agreement "concern[s] an interline movement of the rail carrier" within the meaning of Section 10706 only if the discussion or agreement is about "an identifiable movement or

movements with identifiable circumstances, such as a specific shipper, specific shipments, and specific destinations" and "all of the parties to the discussion or agreement participate in the interline movement or movements that are the subject of the discussion or agreement." *Id.* at 29-30. The court also held that a discussion or agreement about "potential interline business of the participating carriers without regard to specific shipments or movements" does not qualify for exclusion under the statute. *Id.* at 29. Turning to the issue of documents that are internal to one rail carrier, the court held that a railroad's internal documents "may be evidence of a protected discussion or agreement to the extent that [the internal document] summarizes or otherwise conveys the substance of a discussion or agreement that occurred between two or more rail carriers." *Id.* at 27. Finally, the District Court concluded that documents qualifying for exclusion under the statute "need not be either admitted or excluded in their entirety." *Id.* Instead, the court held, the statute's protections may be implemented through redactions and, "to the extent that redaction is impracticable or inadvisable, limiting instructions may be employed." *Id.* at 26.

Defendants then moved to have the District Court certify its order for interlocutory appeal. The District Court granted the motions and certified its order for immediate review. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2021 WL 2433737, at *6-13 (D.D.C. June 15, 2021). Defendants petitioned this court for permission under 28 U.S.C. § 1292(b) to appeal, and a motions panel of this court granted the petitions without prejudice to reconsideration by the merits panel. *See* Order (Aug. 19, 2021), *reprinted in* J.A. 85-86.

We exercise our discretion to hear these consolidated interlocutory appeals pursuant to 28 U.S.C. § 1292(b). "[A]ppellate jurisdiction applies to the *order* certified to the court of appeals, and is not tied to the particular question

formulated by the [D]istrict [C]ourt." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996). As such, we "may address any issue fairly included within the certified order." *Id.*

## II. ANALYSIS

On appeal, Defendants principally challenge: (1) the District Court's interpretation of Section 10706's phrase "concerned an interline movement"; (2) the court's holding that a rail carrier's internal documents are not inadmissible under Section 10706 unless they convey the substance – rather than merely the existence – of a discussion or agreement concerning interline movements; (3) the court's conclusion that the statute's protections can be implemented via redactions; and (4) the court's conclusion that judges can employ limiting instructions under certain circumstances to enforce the protections afforded by Section 10706. We address these issues in order below.

### A. Standard of Review

"The court reviews *de novo* the [D]istrict [C]ourt's . . . statutory interpretation." *United States ex rel. Am. Civ. Constr., LLC v. Hirani Eng'g & Land Surveying, PC*, 26 F.4th 952, 956 (D.C. Cir. 2020), *reissued* 2022.

### B. "Concerned an Interline Movement"

We turn first to the meaning of the statutory phrase "concerned an interline movement." In interpreting a statute, this court begins "with the language of the statute itself" and, if necessary, "may turn to other customary statutory interpretation tools, including structure, purpose, and legislative history." *Genus Med. Techs. LLC v. FDA*, 994 F.3d

631, 637 (D.C. Cir. 2021) (internal quotation marks and citations omitted).

Before this court, Defendants argue that a discussion or agreement "concern[s] an interline movement" within the meaning of Section 10706 if the discussion or agreement "is about—that is, it has practical bearing on—the discussant railroads' shared interline traffic." Opening Br. of Appellants 33. On their read, this "is true regardless of how specific or general the discussion is, and regardless of whether the discussion might be said to concern other things too." *Id.* at 33-34. Defendants maintain that "many of the issues that matter for interline traffic also matter for single-line traffic," and that "[n]obody has explained how interlining railroads could have a reasonable conversation about many essential topics—fuel costs among them—that would not also seem relevant (at least in hindsight) to all traffic." *Id.* at 59-60. For their part, Plaintiffs contend that a discussion or agreement "concern[s] an interline movement" only if the discussion or agreement is "limited to interline movements and [does not] include single-line movements." Redacted Br. for Pls.-Appellees 22. In Plaintiffs' view, Defendants' contrary interpretation "would transform a narrow evidentiary rule into a license for collusion on all rates." *Id.* at 25. Neither party has it right.

We hold that a discussion or agreement "concern[s] an interline movement" only if Defendants meet their burden of showing that the movements at issue are the participating rail carriers' shared interline traffic. A discussion or agreement need not identify a specific shipper, shipments, or destinations to qualify for exclusion; more general discussions or agreements may suffice. For example, evidence of a discussion or agreement about policies applicable to *all* of the participating railroads' shared interline traffic is excludable under Section 10706, provided the evidence satisfies the

statute's other requirements and the court can identify the movements at issue as the carriers' shared interline traffic. The same is true of discussions or agreements about the formation of the participating railroads' interline agreements, as well as about their anticipated shared traffic. A single document may reference more than one discussion or agreement. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 520 F. Supp. 3d 1, 25 (D.D.C. 2021). Defendants acknowledge that this is so. *See* Opening Br. of Appellants 74-75. The court must consider each discussion and agreement separately in determining whether it should be excluded under Section 10706.

Consistent with the foregoing interpretation of the statute, evidence of discussions or agreements about single-line traffic or about freight traffic generally is not excludable under Section 10706. A *de minimis* (*i.e.*, brief and insignificant) reference to non-interline traffic does not automatically disqualify evidence from exclusion under Section 10706. Instead, evidence of discussions or agreements about identifiable interline movements that also contain a *de minimis* reference to other traffic can qualify for exclusion under Section 10706 if the carriers demonstrate that the reference was either fleeting and inconsequential or appropriate to the advancement of the interline discussion itself. To carry this burden, the railroads must demonstrate that any such reference did not change the focus of the discussion or agreement away from the participating railroads' shared, identifiable interline movements.

Our construction of Section 10706 reflects the most natural reading of the statute's text. Rail freight traffic involves two discrete types of movements: interline and single-line, *see* Br. for the United States and the FTC as *Amici Curiae* in Support of Pls.-Appellees and Affirmance 1, 11, and all parties before this court agree that the term "concerned" as it appears

in the statute is synonymous with "about," *see* Opening Br. of Appellants 53 n.4; Redacted Br. for Pls.-Appellees 26; Reply Br. of Appellants 22. Congress used "concerned" to connect "discussion or agreement" with "an interline movement," indicating that a discussion or agreement does *not* "concern[] an interline movement" if the discussion or agreement is about single-line traffic or rail freight generally. Reading "concerned an interline movement" to encompass discussions or agreements about a mutually inconsistent category – *i.e.*, single-line movements – defies logic.

Our interpretation is also consistent with the Act's purpose. The Act states that, "[i]n regulating the railroad industry," the Government's policy is "to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail." 49 U.S.C. § 10101(1); *see also ICC v. Texas*, 479 U.S. 450, 460 (1987) ("In its statement of rail transportation policy, Congress unambiguously expressed its interest in allowing free competition, to the maximum extent possible, to govern the financial health of the railroad industry."). Adopting an expansive interpretation of "concern[s] an interline movement" would render Section 10706 "little more than a de facto immunity for anticompetitive actions that happen to coincide with interline traffic." Br. for the United States and the FTC as *Amici Curiae* in Support of Pls.-Appellees and Affirmance 13 (internal quotation marks omitted). We decline to adopt an interpretation of the statute so clearly at odds with Congress' intent.

At the same time, Section 10706, by its plain terms, evinces Congress' clear desire to allow rail carriers to collaborate with one another about their shared interline traffic. In addition to promulgating the rule of evidence at issue here, the statute provides that proof of a conspiracy "may not be

inferred from evidence that two or more rail carriers acted together with respect to an interline rate or related matter and that a party to such action took similar action with respect to a rate or related matter on another route or traffic." § 10706(a)(3)(B)(ii); *see also* H.R. Rep. No. 96-1430, at 114 (1980) ("[C]arriers must talk to competitors about interline movements in which they interchange. That requirement could falsely lead to conclusions about rate agreements that were lawfully discussed."). Interpreting Section 10706 to require discussions or agreements to contain shipment-by-shipment specificity, or to strip rail carriers of the statute's protections based solely on a *de minimis* reference to non-interline traffic, would significantly frustrate the statute's objective. Finally, the statute's use of the singular phrase "an interline movement" should be interpreted to include multiple movements. *See* 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise—words importing the singular include and apply to several persons, parties, or things."). That reinforces our conclusion that more general discussions or agreements about all interline traffic are excludable under Section 10706.

Defendants' principal counterargument to the reading of "concerned an interline movement" we adopt is that our interpretation renders superfluous the second clause of Section 10706. Under that clause, evidence of a discussion or agreement "concern[ing] an interline movement" is inadmissible only if "the discussion or agreement would not, considered by itself, violate the [antitrust] laws." § 10706(a)(3)(B)(ii)(II). On Defendants' read, discussions and agreements about participating carriers' shared, identifiable interline movements "are never unlawful (at least outside the most contrived hypotheticals)." Opening Br. of Appellants 61. Therefore, they contend, the "paradoxical result," *id.*, of our construction is that no discussion "concern[ing] an interline

movement" could ever, "considered by itself, violate the [antitrust] laws," § 10706(a)(3)(B)(ii)(II).

We are not persuaded. As the Government's *amicus* brief explains, a discussion or agreement can both "concern[] an interline movement" consistent with our interpretation *and* violate antitrust laws. *See* Br. for the United States and the FTC as *Amici Curiae* in Support of Pls.-Appellees and Affirmance 18-19. For example, a larger carrier might pressure a smaller carrier into accepting an unreasonably low share of interline profits under threat of losing access to interline business. *See, e.g.*, *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 177-81 (2d Cir. 1990) (holding that a smaller rail carrier presented genuine issues of material fact with respect to its antitrust claims against a larger carrier where the larger carrier "placed [the smaller carrier] in a bind between giving up almost all of its profits on a given route and losing entirely the ability to carry freight on the route"). Accordingly, the "considered by itself" clause retains full force under our reading of the statute.

## C. Internal Documents

Next, Defendants challenge the District Court's ruling that a rail carrier's internal documents are not inadmissible under Section 10706 unless they "summarize[] or otherwise convey[] the substance of a discussion or agreement that occurred between two or more rail carriers." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 520 F. Supp. 3d at 27. Defendants argue that an internal document referring to the *existence* of a discussion or agreement concerning interline movements with another carrier, even without summarizing the *substance* of that discussion or agreement, is inadmissible. They maintain that "[a]n internal document that references an interline discussion, but does not convey its substance, is an especially powerful invitation to jury speculation about the contents of

that discussion," potentially forcing railroads "to admit the entire interline discussion, just to show that there is nothing nefarious about it." Opening Br. of Appellants 67-68. Plaintiffs disagree, contending that internal documents must reference the substance of an interlining discussion or agreement with another carrier to qualify for exclusion under Section 10706. In their view, a carrier's internal document that does not reference the substance of a such a discussion or agreement "cannot satisfy the plain language of the evidentiary exclusion." Redacted Br. for Pls.-Appellees 41.

We agree with Defendants that a rail carrier's internal documents need not convey the substance of a discussion or agreement concerning interline movements to qualify for exclusion under the statute. Instead, an internal document that references only the *existence* of such a discussion or agreement with another carrier is inadmissible, provided the document meets the statute's other requirements and the court can identify the subject of the underlying discussion or agreement as the participating railroads' shared interline traffic. This holding applies with equal force to internal documents prepared in advance of discussions or agreements with other carriers concerning shared interline movements.

The plain language of the statute supports this conclusion. Section 10706 provides that evidence of a discussion or agreement between or among rail carriers is inadmissible if, among other requirements, "*the discussion or agreement*" "concerned an interline movement *of the rail carrier.*" § 10706(a)(3)(B)(ii)(II) (emphases added). Such a discussion or agreement is "of the rail carrier" only if the discussion or agreement is between or among carriers participating in or that are actively considering participation in the interline traffic at issue. The plain terms of the statute require the "discussion or agreement" itself – but not necessarily the *evidence of* that

discussion or agreement – to be between or among participating carriers. This indicates that a carrier's internal document can qualify for exclusion, provided the underlying discussion or agreement to which the document refers is about the participating carriers' shared interline movements. As such, an internal document that refers to the existence of a discussion or agreement concerning interline movements – without conveying its substance – can qualify for exclusion under Section 10706, provided the court is satisfied that the discussion or agreement to which the internal document refers concerns the participating railroads' shared interline traffic.

This interpretation is also consistent with Congress' expressed desire to allow railroads to collaborate with one another about their shared interline traffic. *See* Section II.B, *supra*. Reaching a contrary conclusion could cause a jury to see references to an interlining discussion's *existence* even if separate evidence of that discussion's *substance* is inadmissible, inviting speculation about what the carriers discussed. Such an outcome would contravene Congress' clear purpose for enacting Section 10706.

For these reasons, a carrier's internal documents need not convey the substance of a discussion or agreement concerning interline movements to qualify for exclusion under the statute.

### D. Redactions

Defendants challenge the District Court's holding that Section 10706 can be implemented via redactions. On Defendants' read, the statute's directive that qualifying evidence "shall not be admissible" indicates that courts cannot implement the statute's protections via redactions. Instead, they argue that under Section 10706, evidence either "comes in, or it stays out." Opening Br. of Appellants 70. Plaintiffs

disagree, maintaining that the District Court properly authorized redactions. They argue that the Railroads' argument against redactions reflects an attempt "to shield unlawful price-fixing agreements if there is a single reference somewhere in the same communication to shared interline movements." Redacted Br. for Pls.-Appellees 55.

We agree with Plaintiffs that Section 10706 can be implemented through redactions of truly segregable portions of documents. As Defendants concede, "different parts of a single document could conceivably reflect two separate discussions, one of which concerns interline traffic, and one of which does not." Opening Br. of Appellants 74-75. Under such a scenario, "redacting only the interline discussion would be appropriate because the unredacted material is not evidence of a qualifying discussion, and thus lacks any claim to inadmissibility under the statute." *Id.* at 75.

The text of Section 10706 does not address the issue of redactions. Absent a clear congressional directive to the contrary, we decline to read the statute as divesting trial courts of their authority to redact truly segregable portions of documents. *See United States v. Lemonakis*, 485 F.2d 941, 949 (D.C. Cir. 1973) (recognizing trial courts' "discretionary power to delete objectionable portions" of evidence "where appropriate"). As such, where segregable portions of documents contain protected evidence of discussions or agreements concerning interline movements, the District Court may employ redactions. However, the Railroads remain free to argue that any contested documents that might be subject to redaction should be excluded in their entirety where the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *See* Fed. R. Evid. 403.

### E. Limiting Instructions

Finally, the Railroads argue that limiting instructions are irreconcilable with the text and purpose of Section 10706. We largely agree.

Defendants convincingly contend that,

[i]n practical effect, the limiting instruction approach negates the statute's purpose. It *allows* a jury to see the interline evidence Congress sought to *exclude*, and leaves it up to the jury to decide what evidence to disregard. But leaving it up to the jury is exactly what Congress did not want, just as it did not want a jury deciding whether, having seen evidence of lawful interline collaboration, a conspiracy existed between interline partners. Exclusion is the only remedy that serves Congress's purpose.

Opening Br. of Appellants 74. Defendants raise compelling points in support of their claim that the text, structure, and purpose of Section 10706 rule out limiting instructions:

Unlike many rules of evidence that permit [limiting instructions], Section 10706 explicitly prescribes a different remedy: The court must evaluate the evidence "before allowing [its] introduction," and evidence meeting the statutory criteria "shall not be admissible." 49 U.S.C. § 10706(a)(3)(B)(ii). That exclusion-based approach to evidence stands in meaningful contrast to the instruction-based approach that Section 10706 takes to impermissible inferences. And in practical effect, the District Court's approach negates the statute's purpose by *allowing* a jury to see the interline evidence Congress sought to *exclude*.

*Id*. at 31-32 (second alteration in original).

What is clear here is that Section 10706 "includes both an inferential protection and an evidentiary rule, which operate very differently at a jury trial." *Id*. at 71. "The inferential portion directs the jury not to infer a conspiracy from certain parallel action, and it is implemented through an instruction at trial." *Id*. at 72. However, the Section 10706 evidentiary rule is meant to guard against juries "fail[ing] to distinguish (a) lawful interline discussions plus parallel action from (b) conspiracy." *Id*. Congress therefore made it clear that "'[t]he court *shall* determine' whether the requirements of Section 10706 are met '*before* allowing the introduction of any such evidence.'" *Id.* at 72-73 (quoting § 10706(a)(3)(B)(ii)). Limiting instructions will not do.

In the light of the text and purpose of Section 10706, we hold that limiting instructions may not be used to enforce the protections of the statute except in those very rare instances in which protected evidence is unavoidably and inextricably intertwined with evidence that does not qualify for exclusion. And in these limited situations, the court must take care to craft instructions that do not open the door to a jury's drawing the very type of inferences that Congress intended Section 10706 to protect against.

### III. CONCLUSION

For the foregoing reasons, we affirm in part and reverse in part the District Court's interpretation of Section 10706. We vacate the District Court's order and remand for the court to reconsider the evidence at issue consistent with this court's interpretation of the statute.